## STEPHENSON v. UNITED STATES.

### No. 42489.

Court of Claims.
March 3, 1947.

Rees B. Gillespie, of Washington, D. C. (John W. Price, of Washington, D. C., on the brief), for plaintiff.

James B. Spell, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

On October 14, 1913, the plaintiff accepted an appointment as assistant surgeon in the Medical Reserve Corps, United States Navy, with the rank of lieutenant, junior grade, and reported for duty the same day. He accepted appointment as assistant surgeon, United States Navy, with the same rank on December 7, 1914. He was promoted from time to time and served continuously on active duty until November 1, 1944, when he was transferred to the retired list with the rank of rear admiral. Plaintiff was a bachelor officer until his marriage on December 20, 1931.

Plaintiff's claim is for rental and subsistence allowances on account of the alleged dependency of his mother upon him for her chief support during the period July 1, 1927, to December 19, 1931.

The plaintiff's father was a practicing physician in Centerville, Tennessee, a town of about 1,000 inhabitants. He began the practice of his profession in 1901. Two other physicians shared the practice of the town and countryside during most of the years of his practice.

There were six children in the family, plaintiff being the first-born. About the year 1910 the plaintiff's father traded the house in which he then lived for a larger house in the town of Centerville, executing notes in the principal sum of $2,500 for the difference.

The father had a downtown office and conducted a general practice. He had bought two farms prior to 1915, neither of which was profitable. Both farms were encumbered, one for approximately $2,000 and the other for about $2,500. He carried insurance in the amount of $25,000, at a premium cost of about $100 a month. His taxes, interest and other expenses were such that he never paid a federal income tax, and he was continuously in debt. He dispensed his own medicines.

While apparently a competent physician, as a businessman he was not very successful. Accumulating obligations finally amounted to several thousand dollars, and his banking credit required the endorsement of other members of the family.

Plaintiff had made an allotment of pay of $50 a month to his mother, beginning in January 1922 and continuing to the time of his retirement in November 1944. He raised this amount to an approximate $75 a month through separate remittances from

time to time. He also made contributions to her of personal wearing apparel, household improvements, furniture and conveniences.

After reading all the evidence and examining the documents in the case we have concluded that during the period July 1, 1927, to December 19, 1931, the plaintiff's mother was dependent upon him for her chief support.

Defendant filed a counterclaim against plaintiff in the principal sum of $2,406.74, made up of two items: $1,315.14 which was allegedly paid to him in error on account of commutation of quarters, heat and light between May 25, 1918, and June 30, 1922, and $1,091.60 which it claims was erroneously paid him on account of increased rental and subsistence allowances between July 1, 1922, and February 28, 1923, on account of the alleged dependency of one or both of his parents. Plaintiff made an allotment of $50 a month in favor of his father, beginning in September 1917 and ending October 1918; another of the same amount to his father beginning December 1918 and ending in November 1919; and another allotment of the same amount as heretofore indicated to his mother in January 1922 and continuing to the time of his retirement. Plaintiff made other cash contributions to his father or mother which averaged about $25 a month. In 1919 he paid for the installation of two complete bathrooms, a kitchen sink, a new stove, a kitchen range, and a Delco pump at a total cost of approximately $750. With these improvements the house became one of the better residences in town.

After going through the evidence and considering all the facts of the case we are unable to deny the validity of this counterclaim. It is true that plaintiff made contributions during this entire period. It is much to his credit that he did so, but in view of the nature and activity of plaintiff's father's practice, and the amount of money he evidently collected, we cannot justify these allowances being made at Government expense, even under the act of 1926,[1] in which payments were ratified if they were contributed to a needy family.

We do not believe, in all the circumstances, that plaintiff's father and mother could be put in that classification during that period. Odlin v. United States, 74 Ct.Cl. 633.

Plaintiff's father was active during that entire period; he had rather an extensive practice, and conditions for the most part were fairly favorable. They lived in one of the good houses of the town, dressed well and did some entertaining; it is true that part of this was made possible by the generous contributions of plaintiff, but all in all there is no sign in the evidence as presented to justify the conclusion that plaintiff's family could be classified during that period as a needy one. The mother took in some boarders, sold some milk and butter and did her own work, but both she and her husband were in good health; they had a successful practice and during that period could have had reasonable comfort aside from the contributions of the plaintiff.

In the period from July 1, 1927, to December 19, 1931, plaintiff's father's health was not so good, he had become financially involved, the mother's health was not good, and there is every reason to conclude that but for plaintiff's contributions to his mother's support both she and her husband would have suffered. The father remained in active practice up until near the time of his death, but he continuously became more involved financially.

Plaintiff's father was a country doctor of the kind we all have known and most of us have loved. He wore his life away in the service of his community. He gave each of his children the opportunity for a good education. He was the kind of a practitioner that is known and appreciated by his neighbors with a deep affection.

He was not a successful businessman. He apparently did not know the value of money. When he got hold of money he was likely to invest in an equity in a hillside farm, which in the main in that area were nonproductive. He continuously made notes to cover expenses during difficult times. These accumulating notes more and more tied up his earnings until such a

---

[1] Act May 26, 1926, 44 Stat. 654.

point was reached that, when he secured a dollar, there was someone waiting to relieve him of its burdens or possible blessings. It is doubtful whether at that time the equities in his properties were materially more than enough to settle his outstanding obligations. These were carried largely because of the contributions made by plaintiff. During this period he practiced medicine in a hill country where there were few good roads and where he was compelled to go at all hours of the night doing much charity work. As his health began to go down and his debts to mount and his interest payments to grow more burdensome, his difficulties were increased and the well-being of himself and especially his wife became more and more anchored to the contributions which plaintiff generously made during his years of service in the Navy. Plaintiff's father practiced medicine for 40 years when there were many hardships to be endured and many difficulties to be faced.

The testimony is conflicting as to whether he was a good collector. One of the other physicians said he was one of the best collectors in the country. His banker and most of his neighbors said he was not very good at collecting and did much charity work. Perhaps it is somewhat dependent upon the slant of the person giving the testimony. His son, who kept his books and who officed next door said many people got the benefit of his services and medicines and didn't pay for them, and that he lost more than half of what he was supposed to collect. The proof is overwhelming that the plaintiff's father spent a lifetime practicing medicine in a small town and country community, working long hours without complaint and waiting on the sick, but because of the expense of educating his children, his unwise investments and his generous nature, he was in difficulty and burdened with debt through all his professional life, and especially during the later years. The bank took a mortgage on the home in the late thirties and later took over the home. It was redeemed in 1940 by the youngest son, who reduced the indebtedness. He tendered his parents a life interest in the property. During the nineteen thirties, insurance, taxes and interest became so heavy that all the insurance was dropped.

If it were a matter of sentiment we would be inclined not only to grant plaintiff's claim for contributions as the chief support of his mother during the period covered by the petition, but also to deny the offset in the nature of a counterclaim. But we must apply the law as we find it, and we do not think the facts justify the allowances that were made to the plaintiff during the first period, which is covered by the counterclaim, on the basis of either the chief support of the mother or as a contribution to a family that was in need, as evidently contemplated by the terms of the statute.

Plaintiff is entitled to recover for rental and subsistence allowances on account of the dependency of his mother upon him for her chief support from July 1, 1927, to December 19, 1931, both dates included. Against this amount the defendant is entitled to a credit of $1,315.14 erroneously paid him on account of commutation of quarters, heat and light, May 25, 1918, to and including June 30, 1922, and also to offset the sum of $1,091.60 erroneously paid to him on account of increased rental and subsistence allowances July 1, 1922, to and including February 28, 1923, on account of the alleged dependency of his parents.

Entry of judgment will be suspended pending receipt of a report from the General Accounting Office showing the amount due plaintiff in accordance with this opinion.

MADDEN, WHITAKER, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.